VALINA R. CROCHERON et al., complainants-appellants,

· *v.*

EDWARD S. SAVAGE et al., defendants-respondents.

[Argued March 8th, 1909.   Decided June 14th, 1909.]

1. An attorney *in hac re* cannot maintain a purchase from a client of
the subject-matter of the retainer unless he demonstrates that he made a
full communication to his client not only of all that he knew, but as
well of all that he believed, respecting the property.

2. If, in the course of his employment, the attorney forms an opinion that the property is more valuable than had theretofore been assumed, and if he fails to disclose that opinion and thus give his client all that reasonable advice against himself that he would give against a third person, the transaction, if questioned, cannot be sustained.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell, whose opinion is reported in *74 N. J. Eq.* (*4 Buch.*) *629*.

*Messrs. McDermott & Enright,* for the complainants-appellants.

*Mr. Robert H. McCarter* and *Mr. William H. Osborne,* for the defendants-respondents.

The opinion of the court was delivered by

DILL, J.

The complainant, Mrs. Crocheron, seeks to set aside a deed of certain real property made by her to her attorney, Mr. Savage, the defendant herein, in the course of his professional employment *in hac re.*

The conveyance is attacked on the ground that it was obtained by the defendant from his client in violation of the rule which requires that an attorney who bargains with his client in a matter of advantage to himself must conduct the transaction in all respects fairly and equitably; that he must fully and faithfully discharge all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client is fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject-matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger.

The learned vice-chancellor, who heard the case below, sustained the transaction and held the deed valid.

We are obliged to differ with the conclusion of the court below, applying the amplification of Lord Eldon's rule (*Gibson* v. *Jeyes, 6 Ves. 266*) as laid down by Mr. Justice Kay in *Luddy's Trustee* v. *Peard (1886)*, 55 *L. J. (N. S.) Ch. Div. 884*, to the effect that an attorney cannot maintain a purchase from a client unless he can demonstrate that he made a full communication to his client, not only of all that he knew, but also, what is pertinent to this case, of all that he believed, respecting the property, its character and value; that where the attorney, in the course of his employment, forms an opinion that the property is more valuable than had theretofore been assumed, if he fails to disclose that opinion and thus give his client all that reasonable advice against himself that he would give against a third person, the transaction cannot be sustained.

Inasmuch as the relation of attorney and client is involved, we discuss the facts somewhat in detail.

The complainant was the owner of an undivided half interest in a certain tract of three acres of salt meadow land on Staten Island sound and Thorp's creek in Middlesex county, New Jersey.

The property in question had, prior to this controversy, been treated, so far as the record of title shows, as a mere adjunct to property on Staten Island, and the history of the title was therefore found in deeds to Staten Island property recorded in Richmond county, in New York state.

About 1890, the Port Reading Railroad Company acquired title to the other undivided half of the property by a deed from one Louis N. Meyer. In the deed to the railroad company, the scrivener attempted to convey this undivided one-half interest in three acres by a description conveying one and one-half acres, although the property had never been partitioned or divided. The railroad, however, took possession of the whole three acres.

The plot in question was so substantially enclosed by other lands belonging to the railroad that the only access to it was by boat, either from Staten Island sound or inland by Thorp's creek. The railroad erected on the immediately adjacent property coal docks, bulkheads, and, particularly, a wharf, which practically closed Thorp's creek to navigation, and thus tended

to cut off the only available access to the *locus in quo* from the land side.

The use made of the land by the complainant and her predecessors in title was to cut salt grass upon the meadow.

Because of the situation and character of the property it had little market value, and as little available value except from its contiguity to the railroad property and from its considerable water front, nearly three hundred feet on Staten Island sound, and approximately seven hundred and fifty feet on Thorp's creek. It therefore occupied a strategic situation and was of primary importance to the railroad.

In 1903, the complainant, who was a widow some seventy-five years of age, without apparent influence or means, employed the defendant, a lawyer of special experience in dealing with properties in this neighborhood, a real estate expert in local values and the owner of similar adjacent property, to represent her as attorney and counsel, and either to sell the property to or force some settlement with the railroad.

The defendant, under his professional retainer, entered into negotiations, but the railroad, sustained as it was by a record title which its attorney had advised was sufficient, seemed to rely upon possession as nine points of the law.

From 1903, to November 1st, 1905, the defendant had various communications with the railroad, asserting his client's ownership of the property, threatening suit and demanding $7,500 for her interest, but he evidently desired to avoid a lawsuit, hoping to convince the railroad that the claimant had title and thus settle the matter.

In October, 1905, he again threatened suit, stating (October 18th, 1905) that he had promised his client that he would file the papers within a week unless the matter was arranged, but would hold the papers until the 23d of October, 1905; that if not settled by that time he would go to Philadelphia and make a demand on the railroad preliminary to commencing the action. But the railroad constantly refused to recognize the complainant's title, although it offered the nominal sum of $100 as peace money for her interest, which she declined.

Finally, in November, 1905, Mr. Savage had an interview with Mr. Cutter, the local counsel for the railroad, in which the latter told Mr. Savage that he had spent two or three days in the Richmond county clerk's office, Staten Island, examining the title; that he had personally inspected the property, and, although the descriptions were somewhat indefinite and differed in the Oakley deed and in the Meyer deed, he thought the property mentioned in both deeds was the same. He then said that the Oakley deed, under which the complainant claimed, called only. for an undivided half of the land, and that if partition proceedings were brought, the company would have set apart to it the land upon which the docks were constructed.

In reference to this interview the railroad counsel testified that he had never admitted before that he thought the property described in the two deeds was the same property.

Mr. Savage testified that Mr. Cutter told him that he had made his report, and that the impression made upon his (Mr. Savage's) mind at that interview was that Mr. Cutter had reported that the complainant had some title.

The facts thus communicated to the defendant that the railroad had through its counsel examined the records in Staten Island and that the counsel had personally inspected the property and was satisfied that the complainant had title to an undivided one-half interest in the property, are important, because, as appears from the evidence on both sides, Mr. Savage became convinced at this time that the railroad now had before it such facts that it must recognize the complainant's claim; and from this he must have formed the professional opinion that the result of negotiations or of a legal contest must eventually be an award to his client, and hence that the value of the client's interest was greater than either he or she had theretofore believed.

After this interview nothing more seems to have been done and no communications passed between any of the parties until the 3d of January, 1906, when the defendant, without previous notice to the complainant, went to her residence at Rossville, on Staten Island, with the admittedly preconceived intention of buying her interest in the property. He took with him a deed, containing a description of the property and ready for execution,

except as to the names of the parties, and, what is quite as significant, he provided himself with $200 in currency with which to pay for the property.

Taking the defendant's version of the interview with the plaintiff and her son, he first mentioned the subject of the proposed purchase to the son and told him that he had spent all the time and all the money he was going to spend on the matter unless he commenced litigation; that he had been referred from one official to another and was no better off than he was three years before; the only offer they had ever made was an offer of $100, and that if his mother wanted to go on with the suit an action in partition would have to be brought that might result in a division of the property and the recovery of her half interest. To this the son replied, "The other half is not worth anything," and then defendant, without advising him, said, "That is something for you to determine."

The defendant told the complainant that the best offer that he could get for her was $100; that he would rather give her $200 for her interest and fight the railroad himself, than give up the fight. He told her plainly that he could not do anything more for her without a lawsuit and that he offered her $200 with the understanding that he was going to fight the railroad through and find out whether they had a half interest in the property or not.

Again, in the presence of the mother, he repeated to the son that $100 was the only offer that he had ever been able to get them to make and the question was whether the complainant should give up the right or bring an action to maintain her title and in his opinion the railroad would not pay anything until they were beaten. The son thereupon said to his mother that she could do as she pleased. Complainant said that she would rather have the money, and the defendant again reiterated his statement that he would give her $200 just for the privilege of fighting the railroad, as he thought they had tried to make a fool of him.

She asked for delay to consider the matter, but he urged immediate action on her part. He then filled out the deed, she executed it, and he paid her the $200. He also agreed to

pay the fees of a former lawyer ($50) and agreed to send a letter explaining the deed which might be sent to the Virginia heirs.

It is admitted that, whether intentionally or otherwise, the defendant failed to make any mention to the complainant of his interview with the counsel for the railroad, or that he had since that time formed any further or other opinion as to the value of the complainant's interest or her chances of succeeding in bringing the railroad to terms. On the contrary, he at once wrote a letter to the complainant to be sent to the Virginia heirs, saying in part:

"The best price that I could offer to you for your undivided interest in the three acre tract is $200. This is $100 more than the railroad company offered and in my opinion is its full value at the present time.

"It has really no value outside of the fact that it may be of some value to me eventually and therefore I have offered $200."

The defendant's negotiations with his client were based upon the position of affairs prior to his interview with the railroad's counsel, and not upon the situation as changed by that interview. He made to her no statement of fact and expressed no opinion as to the changed attitude of the railroad; he failed to disclose the impression made upon his mind by the admissions of Mr. Cutter, the railroad's attorney, but refrained from advising her as to the probabilities of success of the suit, without which he declared nothing could be obtained.

On the other hand, immediately after he became the purchaser, in his further dealings and negotiations with the railroad, he boldly stood upon his interview with Mr. Cutter as establishing the recognition of his client's title.

A side light is thrown upon the conduct of the attorney in not affording the complainant time for reflection and independent advice, but that when she requested delay he urged an immediate execution of the deed.

Four days after acquiring the title the defendant wrote to the railroad, not disclosing his purchase, but assuming to still represent the complainant, and stated that Mr. Cutter had finally concluded that the meadow property purchased by the

railroad from Meyer was only a half interest, and not the whole property, and that the undivided one-half belonged to his client; he suggested an actual partition and stated that he had had the property surveyed and expressed the hope that they could agree upon a fair and equitable division.

After the ownership of the defendant became known negotiations continued between him and the railroad on various lines, for a division of land by conveyances each to the other, by adopting a line of division or drawing by lot, for an exchange of contiguous properties owned by the parties, in which the three acre tract was included, for the purchase or sale at a figure to be fixed by the railroad. In fact, the evidence abundantly shows that the defendant made every effort in his power to realize upon the property without resorting to a lawsuit, to obtain an actual partition by agreement, to effect an exchange of properties, to realize cash upon his half interest by an actual sale at a figure or to purchase the interest of the railroad at the same figure.

Throughout the entire negotiations the value placed upon the property by the defendant was $7,500, or in that immediate neighborhood.

The negotiations having failed, the defendant brought a suit in equity against the railroad, claiming title to the land in question, asking for an accounting and a mandatory injunction against the railroad, enjoining and directing the removal of all the piers, docks, stores, buildings and obstructions, and directing the restoration of Thorp's creek to its natural and navigable condition.

The present suit was commenced nearly two years after the execution of the deed in question and shortly after the suit was brought by the defendant against the railroad.

As to the law applicable to this case, it is well settled. Mr. Justice (subsequently Chancellor) Magie, in this court, stated the rule as follows: "When two parties stand toward each other in any relation which necessarily induces one to put confidence in the other, and gives to the latter the influence which naturally grows out of such confidence, and a sale is made by the former to the latter, equity raises a presumption against the

validity of the transaction.  To sustain it the buyer must show affirmatively that the transaction was conducted in perfectly good faith, without pressure of influence on his part, with complete knowledge of the situation and circumstances, and of entire freedom of action on the part of the seller.  When the confidential relation is that of attorney and client, the attorney who buys must also show that he gave to his client, who sells, full information and disinterested advice."  *Dunn* v. *Dunn, 42 N. J. Eq. (15 Stew.) 431 (at p. 443).*

The same principle is found in the English reports, following the leading case of *Gibson* v. *Jeyes (1801), 6 Ves. 266.*  See *Holman* v. *Loynes (1854), 4 De G. M. & G. 270; Savery* v. *King (1856), 5 H. L. Cas. 627; McPherson* v. *Watt (1877), L. R. 3 App. Cas. 254.*

*Luddy's Trustee* v. *Peard (1886), 55 L. J. (N. S.) Ch. Div. 884,* is closely analogous to the present case.

There a solicitor who had acted for a bankrupt purchased the interest of the latter in a trust estate.  The solicitor had apparently in good faith and without intention to mislead, represented to the trustee in bankruptcy and to his solicitor and to the bankrupt himself that the interest was a life interest only, having no salable value.

But before the purchase the solicitor's professional skill had led him to believe that this construction of the will was doubtful and that it was possible that the bankrupt's interest was, after all, an absolute one, and he also formed the opinion that the estate was much more valuable than appeared from the rental, which he admitted was nothing like its true value.

The solicitor purchased from the trustee in bankruptcy for seventy-seven pounds an estate which was worth two thousand pounds.

The opinion contains the following:

"From a time anterior to the death of the testatrix until after his purchase from Sperring" (the bankrupt's trustee), "J. D. Peard acted as solicitor for Luddy in respect of this property.

"In the course of that employment he was called upon to consider carefully the extent of Luddy's interest under the will.  He

evidently formed an opinion that it was probably an absolute interest, and not merely   *   *   *   a life interest, as described in his letter of the eleventh of December, 1876,   *   *   *   and his subsequent communications with Luddy and his trustee.

"In the course of the same employment he also formed an opinion that the property was more valuable than the actual rental showed. He did not disclose his opinion on these points either to Luddy or to his trustee or the trustee's solicitor. *   *   *

"Putting aside the circumstance of secrecy, and supposing Luddy not to be bankrupt, the case would be one in which Peard could not have maintained such a purchase from Luddy himself unless he could show that he had made a full communication to his client of all he knew or believed respecting the property, and, as Lord Eldon said in *Gibson* v. *Jeyes, 6 Ves. 266,* had given his client all that reasonable advice against himself that he would have given against a third person."

As to the distinction made in the English cases between an attorney *in hac re* and one otherwise situated, see *Montesquieu* v. *Sandys, 18 Ves. 302* (at *p. 313*) ; *Holman* v. *Loynes, supra; McPherson* v. *Watt, supra.*

There is no force in the contention here that Mr. Savage was not the attorney *in hac re.*

It is not necessary to find that the attorney was guilty of intentional wrong-doing. The reason why he did not disclose the material facts upon which we have commented is not important.

The fact that he did not disclose them is sufficient.

The law looks on transactions of this kind between an attorney and his client with suspicion and will not permit a conveyance to the attorney to stand unless the attorney demonstrates the entire good faith of the transaction. It requires him to be absolutely frank and open with his client, to disclose every fact of which he has knowledge, and as well any professional opinion he may have formed, which could in any way affect the client in determining whether or not to make the conveyance. The conduct of Mr. Savage does not measure up to this standard of frankness.

The contention of the defendant's counsel that the Port Read-

ing Railroad Company instigated the present action, and that it is intended to be and is a counter move on the part of the railroad to defeat the injunction suit brought by Mr. Savage against the railroad—or, as counsel graphically puts it, that "the hand of the railroad sticks up like a sore thumb throughout the entire suit from its commencement down to date"—is interesting, but is no defence.

The defendant is answered by the language of Vice-Chancellor (now Mr. Justice) Reed in *Ocean City Railroad Co.* v. *Bray, 57 N. J. Eq. (12 Dick.) 164* (at *p. 167*), where he says:

"In respect to those actions at law wherein malice is not an essential element in the plaintiff's case, or in those suits in equity where intent does not lie at the bottom of the right to relief, the courts will take no notice of the purpose in the mind of the parties in asserting or defending such legal or equitable rights. The right of a party to redress in such instances is *ex debito justiciæ*, and a court has no discretionary power to determine whether it will or will not award to a party his legal or equitable remedy, according to whether the party may or may not be actuated by a malicious or impolitic motive."

In another case Vice-Chancellor Reed aptly said:

"In such case as this, bad motive in the complainant will not defeat the relief. At best it will arouse a suspicious scrutiny of the proofs as to the existence of the conditions upon which the remedy is given." *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 57 N. J. Eq. (12 Dick.) 16* (at *p. 21*).

The United States supreme court has also held:

"If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defence to a foreclosure that the mortgagee was animated by hostility or other bad motive." *Dickerman* v. *Northern Trust Co., 176 U. S. 181* (at *p. 191*). See also *McFadden* v. *Mays Landing and Egg Harbor City Railroad Co., 49 N. J. Eq. (4 Dick.) 176* (at *p. 183*); *Davis* v. *Flagg* (*Chief-Justice Beasley, Court of Errors and Appeals, 1882*), *35 N. J. Eq. (8 Stew.) 491; Roberts* v. *Tompkins,* decided at this term of this court, opinion by Justice Parker;

*McDonald* v. *Smalley*, 1 *Pet.* (*U. S.*) *620; Morris* v. *Tuthill,* *72 N. Y. 575* (at *p. 577*); *Raughley* v. *West Jersey and Sea-shore Railroad Co., 202 Pa. 43.*

The decree below is therefore reversed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Garrison, Swayze, Reed, Parker, Bergen, Voorhees, Minturn, Bogert, Vredenburgh, Vroom, Gray, Dill—13.