67 N.J. Super. 500 (1961)
171 A.2d 97
DAVANNE REALTY CO., ETC., PLAINTIFF,
v.
LEON BRUNE, DEFENDANT AND CROSS-CLAIMANT-APPELLANT, AND JOHN CERVASE, TRUSTEE, MARY CERVASE AND JOHN CERVASE, DEFENDANTS-RESPONDENTS ON CROSS-CLAIM.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 1961.
Decided May 18, 1961.
*501 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Robert B. Kroner argued the cause for defendant and cross-claimant-appellant Brune (Messrs. Bendit, Weinstock, Cummis & Kroner, attorneys).
*502 Mr. Marvin A. Stern argued the cause for defendants-respondents on cross-claim Cervase (Messrs. Bozzuffi & Stern, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant Brune appeals from a Chancery Division judgment in a foreclosure action determining the amounts due to a certain judgment creditor and to defendants Cervase, fixing priorities, and directing a sale of the premises by the sheriff to raise and satisfy the monies owing.
In July 1959 plaintiff Davanne Realty Co. (Davanne) instituted an action to foreclose a first mortgage which defendant Brune had executed on November 1, 1948, covering premises at 31 Harrison Avenue, Harrison, New Jersey, to secure a $7,250 bond of even date. The complaint recited that Brune had on November 12, 1954 mortgaged the property to Finance & Factors Corp. for $9,000, which mortgage was assigned to defendant John Cervase, Trustee, on October 8, 1957. Further, that on October 10, 1956 Brune and his wife had conveyed the premises to Mary Cervase, John's wife. The Cervases were therefore named as defendants.
During the course of the proceedings Davanne assigned its mortgage to a third person and thereafter took no further part in the action. Its complaint has been dismissed. Cervase, who is a New Jersey attorney, continued the foreclosure action as assignee of the second mortgage. Brune then filed his answer as well as a cross-claim against the Cervases demanding an accounting and damages for breach of trust, waste and damage to the property. Extensive depositions were taken of Brune and John Cervase. These were admitted as an exhibit at the trial.
After taking the testimony of Cervase and Brune, the trial judge inquired whether it would be in the interest of justice to continue with other witnesses, and called on Brune's counsel as to what other proofs, if any, he had to offer. Counsel then indicated the witnesses he had in mind and *503 what their testimony would be. The judge concluded that nothing was to be gained by calling any of these witnesses, and therefore proceeded to deliver oral findings which find their reflection in the judgment entered.
At the heart of Brune's claim is the fact that there was an attorney-client relationship between Cervase and him, and that this confidential relationship was violated by Cervase, to Brune's damage. The same contention is vigorously projected before us. Brune claims that Cervase, as attorney, took advantage of him, and therefore all transactions between them should be rendered void and unenforceable, and Cervase made to answer in damages. The second point raised on appeal is that the conduct of the trial by the Chancery Division judge deprived Brune of an opportunity to be heard, and so denied him due process of law.
The Harrison property consisted of a bar and grill and several apartments. The tavern was operated by Peanut Bar and Grill, a corporation owned and controlled by Brune. The property was subject to three mortgages: a first mortgage held by Davanne; a chattel mortgage on the tavern, held by Finance & Factors, in the original sum of $9,000 and dated November 12, 1954, and a second mortgage of even date held by it as additional security for the chattel mortgage loan. At the time Cervase entered the picture in the fall of 1956, Brune was unable to pay Davanne and Finance & Factors the $100 a month and the $75 a week due under their respective mortgages. The mortgages were in default. Brune had judgments against him totalling more than $1,000. Creditors were pressing him from every side.
Brune's story is that he went to his friend Nesto about a loan, so that he might pay all his obligations, consolidate them into one mortgage, and obtain enough money to help rebuild the tavern business. He was referred to Nesto's attorney, Cervase. Brune claims that Cervase agreed to lend him $15,000, to be repaid at the rate of $100 a month for five years, with one final payment at the close of that period.
*504 There is no written evidence or other proof of such an agreement. Defendant denies it, and the exhibits in evidence, bearing Brune's signature, give his story the lie. The trial judge, in the course of his oral conclusions, said he did not believe Brune, but did believe that he signed the several instruments involved in the transaction about to be described. We are in complete agreement with the trial judge's assessment of Brune's credibility. He was evasive both on depositions and on the witness stand. He could not recall important facts. His story did not hang together, and it was flatly contradicted by writings bearing his signature.
On October 15, 1956 Brune personally, and as president of Peanut Bar and Grill, signed an agreement whereby, in consideration of Cervase's obtaining extensions of the two real estate mortgages and the chattel mortgage, and advancing $2,400 to reduce the chattel mortgage and $1,200 to reduce the first mortgage, he agreed to repay Cervase in one year, with interest at 6%, and also to pay off the balances due on the mortgages. If Cervase elected to pay off any one or all of these mortgages, Brune consented to their being assigned to him. The agreement provided that the Harrison Avenue property was to be placed in the name of Cervase or his nominee as security for the money loaned. Peanut Bar and Grill was to pay Cervase $1,000 for "all legal and other charges." Brune personally agreed to pay Cervase for all legal services rendered during the year ending October 15, 1957, and Peanut Bar and Grill made a like agreement.
The property had actually been conveyed by Brune and his wife to Mary Cervase, John's wife and nominee, a few days before the execution of the agreement just described  on October 10, 1956. Cervase received two notes of $500 each, one Brune's and the other Peanut Bar and Grill's. These represented the $1,000 mentioned in the agreement. Peanut Bar and Grill's note was concededly a bonus.
Cervase was successful in obtaining the mortgage extensions by agreeing to pay Davanne $100 a month for 12 *505 months on behalf of Brune, and to guarantee to Finance & Factors 12 notes of $300 each for the ensuing year. As between Cervase and Brune, it was agreed in writing that Cervase would advance $2,400 on account of the 12 notes in the course of the year. The two men subsequently verbally agreed that as a matter of convenience Cervase would pay Finance & Factors $300 a month and Brune pay Davanne $100 a month. Brune was irregular in his payments; at the end of the year he had paid only approximately $700 of the $1,200 due under the extension agreement. Cervase, on his part, had paid $3,600 to Finance & Factors and approximately $200 to Davanne.
It would appear that all these transactions, as well as the negotiations surrounding them, were conducted with the knowledge of one Joseph Tedeschi, an attorney who had represented Brune in an insurance matter before October 1936 and again when the tavern business was sold to Brune's relatives, more than a year later, as mentioned below.
During the course of the extension year Peanut Bar and Grill became involved in a receivership action. Cervase appeared for it as counsel of record and succeeded in settling the matter for $472, advancing $272 of his own money. He charged $250 for these services.
Shortly before the 12-month extension period had run its course, Cervase became fearful that Brune would be unable to meet the $3,800 note representing the balance due Finance & Factors after it had been paid $3,600 on its 12 notes. Cervase claims he made this known to Tedeschi, and that Brune sought to assure him he would have the money when it came due. On October 8, 1957 Cervase purchased the second mortgage and chattel mortgage from Finance & Factors to secure himself against being wiped out by Brune's default and a consequent foreclosure. The balance then due was $3,800 but Cervase paid only $3,100 for the assignment, taking it in his name as trustee. This course was allegedly followed because he had obtained the $3,100 in part by borrowing on an insurance policy on which his daughters *506 were beneficiaries and in part by calling in an outstanding loan held in trust for the daughters.
In the latter part of December 1957 Brune contracted to sell Peanut Bar and Grill to relatives. The sale was closed two months later, the consideration being $5,000 in cash, paid to Brune, and $5,000 by way of assuming the outstanding chattel mortgage held by Cervase. Brune was represented by Tedeschi; the purchasers by an attorney who requested a lease from Brune as beneficial owner of the realty. Mary Cervase was asked to join as lessor because she held the legal title. The lease was executed and delivered.
At about this time Brune requested a statement of his account from Cervase. Such a statement was submitted, captioned "as of October 1, 1957." It showed $9,698 due from Brune, made up as follows:

 "Chattel Mortgage (Interest paid to Oct. 1, 1957) ............. $3,800.00
 Second Mortgage  $3,600 = interest to Oct. 1, 1957 ($216) ... 3,816.00
 Klepisch Note ................................................ 300.00
 Receivership suit loan ....................................... 272.00
 Receivership suit attorney fee ............................... 250.00
 Note of Leon Brune  $500 = interest to Oct. 1, 1957
 ($30.00) ................................................... 530.00
 Note of Peanut Bar & Grill  $500 + interest to Oct. 1, 1957
 ($30.00) ................................................... 530.00
 Advance to Davanne Realty Co. on acct. of first mortgage ..... 200.00
 _________
 Total .............................................. $9,698.00"

The $216 interest on the chattel mortgage was obviously overstated, since it was calculated on the basis of $3,600 rather than on the outstanding monthly balances. The correct amount, Cervase admits, was $117. The $3,800 chattel mortgage claim did not truly reflect the amount Cervase had actually paid for the assignment, $3,100. The $300 Klepisch note was a doubtful claim; Cervase had apparently gotten it with other papers when he took over *507 the Finance & Factors mortgages, and it probably represented one of the 12 notes he had paid, included in the total of $3,600.
In passing upon the several claims of defendants Cervase, the trial judge spoke of the relationship between John Cervase and Brune as an "equivocal" one  "It wasn't a normal clear-cut lawyer and client relationship." He observed that Cervase "occupied somewhat of a dual capacity here." He was both money lender and attorney. Cervase, he said, owed Brune a duty of high fidelity  more than the ordinary duty present in an arm's-length transaction between two businessmen. Thus, a court of equity would consider the relative intellectual abilities of the parties and scrutinize the transaction to see if the attorney had taken any advantage of his client.
After observing that "lawyers who lend money to their clients are very foolish," the trial judge said that one could not escape the fact that Cervase had indeed advanced $3,600 to Finance & Factors on behalf of Brune, and $200 to Davanne. The judge was satisfied that Cervase had paid $3,100 a year later for the assignment of the chattel mortgage and the second mortgage which secured it, and this at a time when there was $3,800 due. Because of the existing "equivocal" relation, he concluded that Cervase should not have the benefit of the $700 profit, but would be entitled to reimbursement for no more than $3,100. Further, the judge was satisfied that Cervase had advanced $272 to settle the receivership matter. In view of the attorney-client relation, he refused to allow Cervase $500 on the note Brune gave him for legal services, but fixed $250 as a reasonable fee. Finally, and as earlier noted, he assigned no credit to Brune's story that Cervase had promised to lend him $15,000 so that he might consolidate his debts and have enough money over to revitalize the tavern business.
The judgment subsequently entered allows the Cervases $3,100 on the chattel mortgage and second mortgage, the $3,800 advanced to Finance & Factors and Davanne, and *508 the $272 expended in the receivership, with interest on each amount, as well as the $250 counsel fee.
Brune claims that all transactions between him and Cervase should be declared void and unenforceable because Cervase had violated the attorney-client relation and taken advantage of him. He refers to Canon 11 of the Canons of Professional Ethics: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." Reliance is also placed on In re Carlsen, 17 N.J. 338 (1955); In re Gavel, 22 N.J. 248 (1956); In re Breckwoldt, 22 N.J. 271 (1956), and Daly v. Watson, 190 A. 320 (Ch. 1936), affirmed per curiam 121 N.J. Eq. 250 (E. & A. 1937).
It must be remembered that this is not a disciplinary proceeding, as in Carlsen and Gavel, but a civil action by Brune on his cross-claim for an accounting and damages. We cannot and do not approve of Cervase's having acted as both attorney and money lender; he should not be allowed to make any profit, secret or otherwise, at the expense of his client, nor any unreasonable legal fee.
Actually, Brune does not complain of the amounts which the trial court found to be due. Indeed, he could not, in view of his testimony admitting that Cervase had paid out these monies. Rather, as we have already pointed out, Brune contends that the trial court applied the wrong rule of law. In his opinion, not only should Cervase, as attorney, account and make restitution for any advantage unfairly gained but all transactions that he had had with Cervase should be declared void. Were we to apply so harsh a rule, Cervase could not recover any moneys legitimately advanced, or any sum the court might allow for services rendered.
Although we wholeheartedly subscribe to the injunction contained in Canon 11, and the spirit and implications of that canon, it does not support the proposition that an attorney who, by investing his money makes a secret profit, should forfeit not only that profit but his investment as well.
*509 The question here is not whether Cervase violated the Canons of Professional Ethics or the familiar rules governing the relation between an attorney and his client. These are appropriate to a disciplinary proceeding, or to a situation akin to that involved in Daly v. Watson or Breckwoldt. Rather, the question is: What financial consequences should flow from a breach of the attorney-client fiduciary relationship?
Brune relies on the language of In re Gavel, above, 22 N.J., at page 262:
"An attorney in his relations with a client is bound to the highest degree of fidelity and good faith. The strongest influences of public policy require strict adherence to such a role of conduct. Since the relationship puts the attorney in a position to avail himself of the necessities of his client and to gain knowledge that can be used to the client's disadvantage, any transactions between attorney and client are presumptively invalid in law  a presumption that can be overcome by only the clearest and most convincing evidence showing full and complete disclosure of all facts known to the attorney and absolute independence of action on the part of the client, In re Blake's Will (Beers v. McConnell), 21 N.J. 50 (1956); Alburger v. Crane, 5 N.J. 573 (1950); Crocheron v. Savage, 75 N.J. Eq. 589 (E. & A. 1909); Canon 11."
and what was said in In re Carlsen, above, 17 N.J., at page 346:
"* * * An attorney who enters into business ventures with his client does not, in the eyes of his client or the public generally, shed in chameleon fashion his professional standing and obligation and there is no just reason why he should be permitted to do so. * * *"
To say, as in Gavel, that a transaction is presumptively invalid in law and may be set aside, does not mean that the party whose conduct is tainted must be subject to a forfeiture. It requires only that the parties be placed in statu quo. The judgment under review did no more. Brune cannot complain that he must repay monies actually advanced by Cervase. Any other result would unjustly enrich him at the latter's expense.
*510 We are cited to no authority which would support the broad proposition Brune urges  that any breach of the attorney-client relation or Canon 11 is punishable by forfeiture. Disciplinary proceedings provide sufficient sanctions against improper and unethical conduct. We cannot, in circumstances such as are here present, impose a financial penalty by forfeiting monies which Cervase advanced to help Brune out of his financial difficulties.
We agree with the trial judge when he said that one cannot escape the fact that Cervase did pay out the $3,600, $3,100 and $272 allowed by the judgment. Cervase was not permitted to recover anything beyond that which was agreed to in writing by Brune, as evidenced by the exhibits in the case. In short, the judgment merely requires that Brune pay back what Cervase had advanced.
Brune's second main contention is that he was deprived of a fair trial by reason of the manner in which the judge conducted the trial. Specifically, he complains that the course of questioning pursued by the court exceeded permissible bounds. He claims that his counsel was afforded little opportunity, beyond a few preliminary questions, to develop his case before the trial judge moved in and took over his (Brune's) direct examination. In short, the charge is that the judge invaded the province of counsel.
We are referred to Canon 15 of the Canons of Judicial Ethics:
"A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto."
Judicial ethics is not the problem confronting us. We are reviewing a judgment, and the issue is whether Brune's *511 rights were prejudiced. There was no objection made at any time during Brune's examination by the trial judge. We must therefore consider whether the conduct Brune complains of constituted plain error.
Brune nowhere suggests just how he was prejudiced by the trial judge's extended examination of him. There was no jury that might be impressed one way or the other. Although it is possible that a trial judge may so take over the entire proceedings as to create prejudicial error even when there is no jury present  see Band's Refuse Removal, Inc. v. Fair Lawn, 62 N.J. Super. 522 (App. Div. 1960)  the absence of a jury is of significance on the question of prejudice. Counsel's reference to State v. Riley, 49 N.J. Super. 570 (App. Div. 1958), is therefore not entirely appropriate. That case was reversed on the very point Brune considers significant, 28 N.J. 188 (1958).
The judge's interrogation of Brune, although lengthy, resulted from the evasive attitude of the witness. For example, he repeatedly evaded answering the simplest of all questions  whether the signature on a particular exhibit was his. Eventually, and under the court's questioning, he would give a direct answer. In other instances he would testify in generalities, and had to be brought down to specifics. In the light of our reading of the record, we do not agree with Brune's contention that the judge assumed the role of an advocate, so that his reliance on the Band's Refuse Removal case is misplaced.
We conclude that the judge's interrogation of Brune in the developing circumstances of the trial, was not so prejudicial as to constitute plain error, i.e., it did not so grievously affect Brune's substantial rights as to have the clear capacity of bringing about an unjust result. See State v. Hipplewith, 33 N.J. 300, 309 (1960).
There were only two witnesses heard at the trial: Cervase and Brune. After the interrogation of Brune had been concluded, the judge specifically asked his counsel why the court should not render judgment for Cervase. It was *512 at this point that he requested counsel to make an offer of proof. After he had done so, the judge concluded that the proofs which counsel indicated he would present would not alter his finding in favor of Cervase.
Brune's counsel offered to produce Tedeschi to testify that he had represented Brune on only the two occasions mentioned earlier in this opinion. Undoubtedly the suggestion was that Tedeschi's testimony would show that Brune had no advice other than that given him by Cervase when the extension arrangements were made and the agreements executed in October 1956, and for more than a year after. But the court was ready to announce, and did announce, exactly what counsel sought to establish, namely, that Cervase and Brune stood in an attorney-client relation, and their dealings had to be considered in that light. Tedeschi's testimony obviously would not have changed that conclusion, but merely reaffirmed it. (We were informed at oral argument that Tedeschi has died.)
Brune's counsel also proposed to have a contractor testify as to the damage suffered by the property since the conveyance to Mary Cervase on October 10, 1956. But that conveyance was admittedly an equitable mortgage; she never considered herself the true owner, nor did Cervase or Brune. Nor was she a mortgagee in possession. We agree with the trial judge that there was no legal obligation on the part of Mary Cervase to take care of the property. Brune had access to it at all times and his was the responsibility for looking after the structure. The building had been in poor physical condition when Brune first came to Cervase, and its further deterioration was not stayed with the giving of a deed to Mary Cervase. Nothing was to be gained by calling the contractor.
Counsel's next offer was to produce two tenants who would testify that Cervase had come to them and said that if they did not pay their rent they would be dispossessed. They subsequently moved. The judge correctly concluded that their testimony was of no consequence. He pointed out that *513 a mortgagee has a right to go to tenants in possession and ask them to attorn where the mortgage is in default.
Finally, counsel proposed to produce a man who in 1956-57 had offered to buy the property for $23,000 and made a $1,000 deposit. The sale fell through when Cervase allegedly demanded $9,000 of the purchase price. The trial judge's answer to this proffer was that if Brune felt aggrieved he could have sought a declaratory judgment and obtained implemental relief in 1957, rather than wait until 1960.
Brune therefore had no opportunity to develop this aspect of the case or to establish that he had suffered damage because of the onerous demand he claimed his attorney had made. It is difficult, without having the testimony of the purported buyer, to determine just how Cervase interfered with the sale  what his demand on Brune was; what he said to the buyer, if anything; the part he played in the aborted transaction. It may be that Brune could have shown that Cervase availed himself of his position and the necessities of his client to do something that was to Brune's disadvantage. See In re Gavel, quoted above.
In our opinion, the trial court should have permitted the claim of Cervase's interference with the sale of the property to be developed at length, however dubious one might be of Brune's ultimate success. The cause will therefore be remanded for the taking of whatever testimony is necessary to throw light on the alleged sale and, if Cervase's interference is established, what damages, if any, flowed from it. Should Brune be successful on this phase of the case, a new judgment can then be entered reflecting the damages suffered and setting them off against the amounts now fixed as due Cervase.