# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1551-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

O.J.T.,

    Defendant-Appellant,

and

L.MC.L.,

    Defendant.

_____

IN THE MATTER OF J.L.T.R. and
J.C.T.R., minors.

_____

Submitted November 20, 2025 – Decided November 26, 2025

Before Judges Mawla and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0069-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Eric Storjohann, Assistant Deputy Public Defender, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Steph Kozic, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant O.J.T.[1] appeals from a January 8, 2025 judgment of guardianship, which terminated her parental rights to two of her children. We affirm.

We summarize the facts adduced at a three-day trial wherein the Division of Child Protection and Permanency (Division) presented testimony of an expert in clinical and forensic psychology, factual testimony from the Division's adoption specialist and custodian of records (caseworker), and thirty-one exhibits. Defendant neither testified nor presented witnesses. However, the

---

[1] We use initials pursuant to Rule 1:38-3(d).

biological father of the children, L.MC.L., who is not appealing, testified; called his on-again, off-again fiancée as a witness; and offered three exhibits.

Following the testimony, the trial judge issued a lengthy oral opinion and concluded the Division proved all four prongs of the statutory best interests test, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence. She found the Division's witnesses credible, and the fiancée not credible. At the outset of her opinion, the judge stressed she was treating each parent separately, so as not to have the conduct of one influence her decision regarding the other.

The judge found the Division proved the first two best interests prongs because the facts and undisputed expert testimony showed each parent was unable to safely parent the children and placing the children in their care would endanger their health and development. The father had substantial behavioral, mental health, and criminality issues. The Division became involved and removed the children at birth, because while defendant was in the hospital, she exhibited bizarre and threatening behavior. This was driven by the combined effects of defendant's unaddressed drug use and mental health problems. Defendant's conduct was unsafe for the children; both of whom were born premature, "spent considerable time in the" neo-natal intensive care unit, and were vulnerable.

A-1551-24

In addition to defendant's mental health and drug problems, she lacked adequate housing, lived in a motel, lacked employment, and could not provide a stable and protective home. The judge credited the Division expert's testimony defendant had "significant psychological traits," which made her unable to safely parent at present or into the foreseeable future. Defendant refused to cooperate with the Division and its efforts to achieve reunification, including failing to complete court-ordered substance abuse treatment, a mental illness and chemical abuse program (MICA), and parenting class. Although defendant availed herself of visits with the children, her conduct during visits showed "significant behavioral problems, cursing, smoking, inappropriate behavior, threats[,] and otherwise." The judge observed defendant continued daily drug use and "sees no problem with it."

The judge concluded defendant remained at "square one," notwithstanding her involvement with the Division for one-and-a-half years. This harmed the children, due to the "[w]ithholding of parental attention and care, [and] the failure to provide for the children's daily needs." The children spent their entire lives in placement and their "unfilled need for a permanent home is a harm in and of itself."

4

As for the third best interests prong, the judge found the Division "made more than reasonable efforts to provide services to help the parents correct the circumstances[,] which led to the . . . children's placement outside the home." The services offered to defendant included: "Substance abuse evaluations, psychological evaluations, neuro-psychological evaluations, referrals for . . . MICA over and over and over, . . . higher level of care, urine screens she didn't attend, parenting classes, bus passes, [f]amily [t]eam [m]eetings, visitation, supervised visitation, therapeutic visitation, virtual visitation, [and] checking out other placements."

The Division investigated at least ten relatives and others, between both parents, as placements for the children. However, these individuals either could not be reached, did not respond to the Division, or were ruled out and failed to appeal from the rule-out decision. In reviewing the Division's evidence, the judge noted there was an eleventh individual the father identified as a potential placement. However, the caseworker was unaware if this person was assessed. Although the judge would have "preferred to have this information," given "the totality of the testimony and the evidence," she did not find it was "a critical deficit to the Division's proofs of clear and convincing [evidence] as to the third prong." This was because the father presented no evidence of his relationship

5

with this person or her interest in caring for the children. The judge questioned why the father never raised the person's name in the seven months after giving it to the Division. She found "the Division . . . acted diligently, complied with their obligation and law to search from the outset and place the [children] with family. [It] . . . followed up on the names[ and] . . . continued to ask . . . the parents for family or friends for placement."

The Division ruled out the fiancée because it was concerned she would be residing with the father once he was released from prison. The judge noted she never appealed from the rule out and her testimony was evasive because she answered questions and then looked at the father as if to say, "is this the answer you want me to give?" In addition to being naïve, the fiancée was not credible in her claim she did not receive the rule-out letter because she admitted to speaking with the Division after the letter was sent. The judge concluded she was not a placement option because her answers to questions regarding her intentions to care for the children and the nature of her relationship with the father were "very hesitant." Her plans were "difficult to ascertain" and "unrealistic" because the father would never let her raise the children without him. The judge foresaw issues with the children's safety and the fiancée's ability to protect them. Moreover, she viewed herself as a short-term placement for the

children, which is not what the children needed. Her testimony convinced the judge she did not understand the situation.

The judge concluded adoption by the resource home was in the children's best interests. The facts and evidence presented no other option. The expert testimony underscored adoption would provide the children with the permanency and stability they deserved.

Along these lines, the judge concluded the Division also proved the fourth best interests prong. The children lived with the resource parents since birth, and a permanent disruption of that relationship would cause them harm because the resource parents addressed their medical, educational, and psychological needs. Both children were "growing, developing, [and] learning to talk." There were "[n]o concerns in the home." The judge read the entire record, which confirmed there were no issues with the resource parents' care of the children. "The children are well-cared for and loved by the resource parents."

The caseworker personally spoke with the resource parents regarding the differences between KLG and adoption, in addition to providing them with literature on the topic. Both parents signed forms confirming they received this counseling and wished to adopt.

7

The judge concluded "there's no question . . . termination of parental rights will not do more harm than good. These children really don't even know the parents."

I.

On appeal, defendant focuses her challenge on the third best interests prong. She argues the Division had a statutory obligation to locate and assess placements and failed to meet its obligation. The trial judge improperly shifted the burden to the parents, by basing her assessment of the Division's reasonable efforts exploring alternatives to termination of parental rights on the information the parents provided, after the Division required them to contact potential relative resources and provide their contacts. The judge also erred because she concluded some of the names provided by the father were ineligible because they had not contacted the Division and the father only wanted them to serve as placements, rather than kinship legal guardians.

The Division also thwarted a KLG by threatening the removal of a third child belonging to defendant, who resided out of state with the maternal grandmother, which deterred the grandmother from serving as a relative resource. It also required family members who wanted to serve as a relative resource to submit to a psychological evaluation, which in turn discouraged

them from coming forward as a resource. At trial, the judge asked the caseworker leading questions in a biased manner to rehabilitate the fact the Division improperly required psychological evaluations to prevent relatives from volunteering for KLG.

Defendant argues the judge's finding the Division met its reasonable efforts obligation by repeatedly referring defendant for services was erroneous because these repeated referrals evidenced the fact the services provided by the Division did not meet her needs. The Division failed to refer defendant for a higher level of care to address her mental health issues.

## II.

Our scope of review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's fact findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). Our deference is owed to the judge's credibility determinations "based upon [their] opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to a judge's interpretation of the law, which we

review de novo.  N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

The best interests of the child standard is codified in N.J.S.A. 30:4C-15.1(a), and requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests."  In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

Pursuant to N.J.S.A. 30:4C-15.1(c), "reasonable efforts to provide services" under prong three means "attempts by . . . the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure."  A court's "evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis."  In re Guardianship of DMH, 161 N.J. 365, 390 (1999).  "'Reasonable efforts' will vary depending upon the circumstances of [a child's] removal."  N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007).  The Division must focus on reunification, and the services utilized to facilitate this must be "'coordinated'" and have a "'realistic potential to succeed.'"  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).  Nevertheless, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success," DMH, 161 N.J. at 393, particularly where the lack thereof is due to a parent's "failure to cooperate or follow through" with services and obligations.  N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

N.J.S.A. 30:4C-12.1(a) requires the Division to search for relatives and friends "who may be willing and able to provide the care and support required by the child[ren]." Searches are "completed when all sources contacted have either responded to the inquiry or failed to respond within [forty-five] days." N.J.S.A. 30:4C-12.1(a). The statute does not state the number of times the Division must attempt to contact a resource; the Division is afforded deference in determining who to rule out. See N.J.S.A. 30:4C-12.1; N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87, 89 (App. Div. 2013).

Because the best interests of the children are paramount, a parent's desires or objections to potential placements do not dictate the Division's considerations. N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 577-79 (App. Div. 2011). Conversely, a "[d]elay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child." Id. at 581.

"Although [KLG] cannot be used as a defense to the proper termination of parental rights, it should not be excluded as an alternative by means of faulty information." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 233 (App. Div. 2013) (citation omitted). Trial courts must "consider the totality

12

of the circumstances in deciding whether to terminate parental rights." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 5, 17 (2023).

The trial judge correctly concluded the several relatives and friends of both parents investigated by the Division evidenced it acted diligently to pursue an alternative to the termination of parental rights. At trial, the father's attorney pointed out the father provided a list of individuals in August 2023, not all of whom the Division contacted, and the name of another person in March 2024, which the judge noted the Division also did not contact. However, the father repeatedly testified he did not want the people on his list to be assessed for KLG purposes. He intended for them to serve only as placements because he intended to have the children.

KLG is impermanent in the sense that biological parents retain certain rights vis-à-vis their children. See N.J.S.A. 3B:12A-6(e)(2) to (4), (5). There are also certain conditions where KLG can be vacated. See N.J.S.A. 3B:12A-6(f), (g).

Given the totality of the circumstances, namely: the children's need for a safe and stable home; the father's substantial deficits and inability to safely parent the children or eliminate the harm to them; and his intent to have the children, we are unconvinced the placements the Division investigated did not

meet its obligation to explore alternatives to the termination of parental rights. We do not base our decision on the father's preferences, but point them out because they revealed his intent, which was opposite the children's best interests and need for permanency. Defendant's arguments on appeal do not convince us otherwise.

The record lacks any evidence of the Division threatening the maternal grandmother. The Division interviewed the grandmother to see if she wanted to be a placement and discussed helping her obtain services for the child in her care. This argument lacks merit.

Similarly, there is no evidence the Division used psychological evaluations as a cudgel to prevent relatives from coming forward. As the judge noted, no psychological evaluations were conducted on any possible placement. Regardless, the Division intended to use the evaluations to ensure the relative placement understood the risks involved with caring for the children based on the safety concerns raised by defendant and the father's erratic behavior and actions. This was consistent with the law, which requires consideration of "the potential kinship [caregiver]'s ability to provide a safe and permanent home for the child[ren]" and "the suitability of the kinship caregiver and the caregiver's family to raise the child[ren]." N.J.S.A. 3B:12A-6(a)(5), (8).

14

We reject defendant's claim the trial judge was biased because she questioned the caseworker regarding the psychological evaluations of the relative resources. Defendant points us to the following colloquy:

> [THE COURT]: Current resource parents . . . my understanding is the Division doesn't require current resource parents to have psychological evaluations, right?
>
> [CASEWORKER]: Correct.
>
> [THE COURT]: Okay. In . . . most circumstances, right?
>
> [CASEWORKER]: In most – correct.
>
> [THE COURT]: Okay. The resource parents are unrelated, right?
>
> [CASEWORKER]: Yes. Correct.
>
> [THE COURT]: They've observed the interaction of the parents and the children because they've been on the video calls, right?
>
> [CASEWORKER]: That's correct.
>
> [THE COURT]: Okay. So, when you're saying the reason . . . the Division . . . would want a relative to have a psychological evaluation so that they would understand the risks . . . or what's involved and . . . I don't want to put words in your mouth. I want to understand. Is that because they haven't observed the parents with the children?

15

[CASEWORKER]: Yes[, y]our [h]onor. Exactly. That's what it is.

The judge then asked counsel if they had any follow up questions. She afforded counsel an opportunity to confer with their clients and each parent's attorney asked the caseworker a few questions.

The Rules of Evidence permit judges to call and interrogate witnesses. N.J.R.E. 614. However, judges must be sensitive to perceptions of impartiality. State v. Medina, 349 N.J. Super. 108, 130 (App. Div. 2002). Intervention in a case should be limited and "exercised with restraint." Id. at 131. If a judge's questions cross a line, which appears to result in advocacy, then the judge has committed a prejudicial error. Davanne Realty Co. v. Brune, 67 N.J. Super. 500, 511-12 (App. Div. 1961).

During bench trials, judges may ask questions to clarify answers and "to fully develop the truth." Medina, 349 N.J. Super. at 131 (quoting Kristine Cordier Karnezis, Annotation, Manner or Extent of Trial Judge's Examination of Witnesses in Civil Cases, 6 A.L.R. 4th § 3[a] (1981)) (holding a judge was impartial while questioning witnesses because he sought to clarify testimony); D.M.R v. M.K.G., 467 N.J. Super. 308, 320-21 (App. Div. 2021) ("In a bench trial . . . , a judge may examine witnesses to clarify testimony, aid the court's understanding, elicit material facts, and assure the efficient conduct of the

16

trial."). Questions which appear to cross the line include those suggesting a "capacity to signal disbelief" and ones already asked by counsel. State v. Taffaro, 195 N.J. 442, 453 (2008) (a criminal jury trial case); State v. O'Brien, 200 N.J. 520, 537 (2009) (holding, in a criminal jury trial case, a judge's asking of questions, which "hammer[ed] home the prosecutor's view of defendant's memory as selective, and leaving the impression that he did not believe defendant's claim" resulted in prejudice).

The impact of the questions is what matters most. Taffaro, 195 N.J. at 454. However, "[a] judge sitting as the factfinder is certainly capable of sorting through admissible and inadmissible evidence without resultant detriment to the decision-making process." State v. Kern, 325 N.J. Super. 435, 444 (App. Div. 1999). Trained judges have the ability "to exclude from their consideration irrelevant or improper evidence and materials which have come to their attention." State v. Kunz, 55 N.J. 128, 145 (1969).

Initially, we observed the judge's questioning followed the conclusion of the caseworker's direct, cross-examination, and re-direct examination by the parties' attorneys. It also followed questions by defendant's counsel that the psychological evaluations were only required of the family members. The caseworker stated the evaluations were for the safety of the children and the

relative resources. Counsel then questioned whether the resource parents were required to have psychological evaluations and the caseworker responded they did not. Therefore, taken in context, the judge's questions sought to clarify the reasons why the Division would subject family to psychological evaluations and not the resource parents. We discern no reversible error.

Finally, we reject defendant's assertion the services offered by the Division were ineffective because they were not tailored to her specific mental health and substance abuse needs. When defendant required a higher level of care, the Division found another program for her to attend. Throughout the case, the Division followed up to ensure defendant complied with the services and was receiving the care she required. The record reflects the court also monitored the matter at the numerous court conferences conducted during the litigation. The evidence supports the trial judge's findings the Division's reasonable efforts did not succeed because of defendant's failure to either enroll in or complete services, nothing more.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Harley

Clerk of the Appellate Division

18