793 A.2d 68 (2002)
349 N.J. Super. 108
STATE of New Jersey, Plaintiff-Respondent,
v.
Milton MEDINA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2002.
Decided March 12, 2002.
*71 Patricia A. Lee argued the cause for appellant (Alan L. Zegas, attorney; Mr. Zegas and Ms. Lee, on the brief).
Elizabeth A. Miller-Hall, Special Deputy Attorney General, argued the cause for respondent (Donald C. Campolo, Assistant Attorney General, Acting Essex County Prosecutor, attorney; Ms. Miller-Hall, of counsel and on the brief).
Before Judges BAIME, NEWMAN and FALL. *69
*70 The opinion of the court was delivered by BAIME, P.J.A.D.
This case concerns allegations that five members of the Newark Police Department engaged in a conspiracy to steal firearms that had been surrendered to the police under the City's "Gun Amnesty and Buyback" program. The State's theory was that Lieutenant Milton Medina and Patrolman Jose DaSilva stole a Marlin twelve gauge shotgun that had been surrendered to the Newark East District Precinct Station, and that police officers Robert Russo, John Zajkowski, and John Lavook participated in the unlawful scheme. A grand jury returned a seventeen count indictment charging the five men with a variety of crimes stemming from their roles in the criminal plot. The indictment charged defendant Medina with second degree conspiracy (N.J.S.A. 2C:5-2 and N.J.S.A. 2C:30-2a and -2b), third degree conspiracy (N.J.S.A. 2C:5-2 and N.J.S.A. 2C:20-3a), two counts of official misconductone by engaging in the unauthorized exercise of an official function (N.J.S.A. 2C:30-2a), and the other by refraining from performing an official duty (N.J.S.A. 2C:30-2b), and third degree theft of a firearm (N.J.S.A. 2C:20-3a).
*72 After Zajkowski and Russo pled guilty, the Law Division granted the State's motion to dismiss the conspiracy counts, and to downgrade the remaining charges against Medina, DaSilva and Lavook to disorderly persons offenses. Following a protracted bench trial, the Law Division judge found Medina guilty of obstruction of justice (N.J.S.A. 2C:29-1) and theft of an article worth less than $200 (N.J.S.A. 2C:20-3). Medina was sentenced to concurrent probationary terms of one year. The convictions resulted in the forfeiture of defendant's office.
Defendant appeals, contending: (1) the Law Division erred by permitting the prosecutor to downgrade the charges to disorderly persons offenses, thus depriving him of his right to a jury trial, (2) the judge committed plain error by failing to recuse himself, (3) the judge's questioning of Lavook and other witnesses unfairly bolstered the State's case, and (4) the judge improperly denied his motions for a judgment of acquittal. We reject these arguments.

I.
On January 26, 1998, Newark Police Director Joseph Santiago issued a directive describing the duties of police personnel in implementing the City's Gun Amnesty and Buyback program. The program was to be managed by each district's supervisor, usually the desk lieutenant. He was to ensure that requisite forms, including a log listing the gun's serial number and identifying the specific weapon, were completed, and that the designated payment was disbursed to the person surrendering the firearm. The amount of the payment was not negotiable, but depended upon the type of weapon surrendered. Under the directive, the person surrendering the firearm could insist that he remain anonymous. The weapon was to be secured in the district police station, and was to remain the property of the Newark Police Department.
On March 6, 1998, Officer Maryann Weber was assigned desk duty from 10:00 p.m. to 6:00 a.m. at the east district station. According to her testimony, Medina was the desk lieutenant, having assumed that responsibility after Russo completed his shift. At approximately 5:30 a.m., a male entered the station and asked to surrender a twelve gauge Marlin shotgun. Weber observed defendant exchange cash, which he obtained from a cashbox designated for that purpose, for the gun. After surrendering the weapon and obtaining the designated payment, the man exited the police station.
Weber testified that Medina mentioned to Officer Joseph Martin, who was seated behind the desk, that the firearm was in excellent condition and that it was a good weapon for hunting. Because Weber was the "processing officer," it was her duty to complete the necessary paperwork. She thus asked Medina, who was holding the shotgun, to inform her as to the name of the manufacturer, model and serial number. Medina apprised Weber of the name of the manufacturer and the model of the weapon, but not the serial number. Weber recorded the "make and model" of the weapon on the appropriate log sheet. She then obtained a "central complaint" and an "incident" number for the shotgun. Weber had not yet recorded the numbers on the form when Lavook entered.
Lavook was scheduled to be the next desk supervisor. According to Weber, Lavook told her that she could leave because her workday was completed. Weber gave the paperwork to Martin, who was to record the remaining information. When she exited the police station, Medina was still holding the gun. Martin and DaSilva were in the area of the front desk, and DaSilva was conversing with Medina.
*73 Martin testified that he, Medina, Zajkowski and Lavook were in the front desk area when a man entered the station at approximately 5:30 a.m. and asked to surrender a shotgun. According to Martin, the man exchanged the gun for the designated payment and left the station house. DaSilva and another officer, Evaristo Cordero, entered the precinct several minutes later, accompanied by a prisoner. After Cordero took the prisoner into another room, DaSilva and Medina passed the shotgun back and forth between them. Weber, who was recording the requisite information for the surrender of the shotgun, departed from the station, leaving Martin to complete the applicable forms.
Before Martin could complete the form, Medina handed him a Smith and Wesson five-shot revolver and directed him to process the gun for the amnesty program. Martin did not see anyone surrender the revolver, and did not know how or when Medina had obtained the firearm. Moreover, Martin noticed that the information Weber had recorded with reference to the surrender of the Marlin shotgun had been deleted with white correction fluid. The only information that remained in the log was the central complaint number and Weber's signature. Martin entered the information pertaining to the revolver in the blank boxes from which Weber's recordations had been deleted. The logbook thus showed only that the Smith and Wesson revolver had been surrendered. No reference was made to the Marlin shotgun. Moreover, Martin completed a receipt form purporting to show that the revolver had been surrendered at 5:30 a.m. Lavook signed the receipt, and Martin placed the revolver in the police department's property room.
State Police Sergeant Daniel Poland, an expert in the field of document examination, inspected the precinct's log sheet for March 6, 1998, and determined from laboratory analyses that the original writings had been altered with correction fluid. Using an infrared film process, the witness determined that the words "Marlin" and "twelve gauge" had been covered with correction fluid.
Sergeant Sheila Fitts of the Newark Police Department's Internal Affairs Bureau testified that Newark police officers are trained not to use correction fluid. They are instead directed to draw a line through incorrect entries so that the original mistake remains legible and to write the correct information on another line. Fitts recounted that a thorough search of the precinct disclosed no trace of the Marlin shotgun. Also missing from the precinct's records was a "desk blotter" for March 6, 1998. Fitts explained that Medina, as the supervising desk lieutenant, was required to document everything that occurred on his shift on a form called a "desk blotter." Despite an extensive search of the clerk's office and the storage room where such documents are maintained, the desk blotter for Medina's March 6th shift was not found. We note, however, that the desk blotter was subsequently discovered and admitted in evidence by stipulation. Medina had entered in his supervisor's log that he was investigating an automobile accident on Ferry and Shalk Streets between 5:05 a.m. and 5:40 a.m. This entry conflicted with the accounts of all of the police officers present in the east district station house on the morning in question. It was also inconsistent with defendant's trial testimony.
Defendant testified that he was present at the east district station between 5:05 a.m. and 6:45 a.m. According to defendant's testimony, a man entered the station house shortly after he began his shift as desk lieutenant. The man asked to surrender a shotgun pursuant to the amnesty *74 program. The weapon was enclosed in a case. Upon removing the shotgun from the case, Medina observed a shotgun permit in the case.
Medina claimed that he was unable to find a serial number on the gun. He thus handed the weapon to DaSilva, who also could not find a serial number. Medina asserted that the owner of the weapon expressed dissatisfaction with the amount to be paid in exchange for the firearm and decided not to surrender the gun. Medina allegedly returned the weapon to the man and allowed him to exit the station house, despite the fact that neither he nor DaSilva was able to find a serial number on the gun. Moreover, Medina did nothing to memorialize the incident, although he admitted that, as desk lieutenant, he was required to report to the division commander any significant or unusual event occurring during his shift.
Medina testified that another man relinquished a Smith and Wesson five-shot revolver during his shift. According to Medina, Lavook accepted the weapon after paying the man. Medina asked Martin to process the paperwork pertaining to the revolver. Medina disputed Fitts' testimony that Newark police officers were forbidden to use correction fluid in completing official documents. He asserted that this policy pertained only to sworn statements.
DaSilva's testimony substantially corroborated Medina's account. According to DaSilva, a man entered the station house asking to surrender a shotgun pursuant to the amnesty program. DaSilva recounted that the man left the station with the weapon after expressing dissatisfaction with the amount of the payment. The man was allowed to leave with the weapon although neither Medina nor DaSilva was able to find a discernible serial number on the firearm.
Lavook testified that he assumed the duty of desk lieutenant at approximately 5:35 a.m. According to his testimony, a man entered the station house at 5:55 a.m. and surrendered a Smith and Wesson five shot revolver. Lavook did not recall anyone relinquishing a twelve gauge Marlin shotgun during his tour of duty. He admitted that he would not have permitted a person to leave the station house with a firearm that did not have a serial number, whether or not a permit was produced. The officer also admitted that, as a lieutenant, he would not allow police personnel to obliterate an entry in an official document with correction fluid. He asserted that he would have conducted "an immediate investigation" had he noticed the correction fluid on the control log.

II.
We first address Medina's argument that he was deprived of his constitutional right to a trial by jury when the Law Division permitted the prosecutor to downgrade the crime of third degree theft to a disorderly persons offense. We find no merit in this contention.

A.
In Blanton v. City of N. Las Vegas, Nevada, 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989), the United States Supreme Court held that if the maximum sentence of incarceration for an offense is six months or less, society views that violation as "petty," and there is presumptively no right to trial by jury. Id. at 543, 109 S.Ct. at 1293, 103 L.Ed.2d at 556. That conclusion was based on a long history of non-jury trials for what were regarded as minor offenses in colonial courts. Id. at 541-42, 109 S.Ct. at 1292-93, 103 L.Ed.2d at 555-56. Despite our historical veneration of the right to trial by jury, the common law has always recognized a wide *75 range of petty offenses triable without the interposition of a jury. See Felix Frankfurter & Thomas G. Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L.Rev. 917, 980-81 (1926).
Blanton rests on the thesis that "[t]he best indicator of society's views [as to the gravity of an offense] is the maximum penalty set by the legislature." United States v. Nachtigal, 507 U.S. 1, 3, 113 S.Ct. 1072, 1073, 122 L.Ed.2d 374, 378 (1993) (citing Blanton v. City of N. Las Vegas, Nevada, 489 U.S. at 541, 109 S.Ct. at 1292, 103 L.Ed.2d at 555). While the word "penalty" refers both to the term of imprisonment and other statutory consequences that attach to a conviction, the Court has said that "`primary emphasis... must be placed on the maximum authorized period of incarceration.'" United States v. Nachtigal, 507 U.S. at 3, 113 S.Ct. at 1073, 122 L.Ed.2d at 378-79 (quoting Blanton v. N. Las Vegas, Nevada, 489 U.S. at 542, 109 S.Ct. at 1292, 103 L.Ed.2d at 556). A defendant can overcome the presumption that an offense is "petty" when the maximum term of imprisonment is six months or less "only by showing that the additional penalties, viewed together with the maximum prison term, are so severe that the legislature clearly [categorized] the offense [as] a `serious' one." United States v. Nachtigal, 507 U.S. at 3-4, 113 S.Ct. at 1073, 122 L.Ed.2d at 379 (citing Blanton v. City of N. Las Vegas, Nevada, 489 U.S. at 543, 109 S.Ct. at 1293, 103 L.Ed.2d at 556).
The maximum sentence that attaches to a disorderly persons conviction is six months incarceration. N.J.S.A. 2C:1-4c. However, Medina was statutorily required to forfeit his office by virtue of his conviction. See State v. Lore, 197 N.J.Super. 277, 283, 484 A.2d 1259 (App.Div.1984) (the disabilities enumerated in N.J.S.A. 2C:51-1 and N.J.S.A. 2C:51-2 can be invoked upon a conviction for "an offense," including a disorderly persons violation). The question then is whether the statutorily mandated forfeiture of office is such an onerous penalty that it "puncture[s] the [six]-month incarceration line" and implicates the constitutional right to a jury trial. Blanton v. City of N. Las Vegas, Nevada, 489 U.S. at 543, 109 S.Ct. at 1293, 103 L.Ed.2d at 556-57.
Forfeiture of office is undoubtedly a serious penalty. This penalty "may be waived by the court upon application of the county prosecutor or the Attorney General and for good cause shown." N.J.S.A. 2C:51-2(e). Here, however, a waiver of forfeiture was unwarranted. See Flagg v. Essex County Prosecutor, 171 N.J. 561, ___, 796 A.2d 182 (2002) (establishing the appropriate standard for determining whether the decision to decline a waiver of forfeiture of public employment pursuant to N.J.S.A. 2C:51-2 based on a conviction for a disorderly persons offense was proper). That penalty was imposed not merely because Medina was convicted of a disorderly persons offense, but rather because the offense involved "dishonesty," N.J.S.A. 2C:51-2a(1), and "touch[ed][his] office," N.J.S.A. 2C:51-2a(2), as a police lieutenant. Forfeiture was thus a collateral consequence of defendant's conviction. Forfeiture is "a civil remedy intended to assure that public affairs are conducted by persons untouched by the stigma of [an offense] involving dishonesty ... or touching office." Cannel, Criminal Code Annotated, Comment 6 on N.J.S.A. 2C:51-2 (2001-02) (citing Ayars v. New Jersey Dept. of Corr., 251 N.J.Super. 223, 597 A.2d 1084 (App.Div.1991)). For that reason, we have considered the penalty as a collateral consequence of a conviction, one that need not be conveyed to a defendant in plea proceedings. State v. Heitzman, *76 209 N.J.Super. 617, 622, 508 A.2d 1161 (App.Div.1986), aff'd o.b., 107 N.J. 603, 527 A.2d 439 (1987). As a result, a defendant is not entitled to withdraw a plea of guilty because he was not informed that a collateral consequence of the conviction is loss of public office. State v. Riggins, 191 N.J.Super. 352, 466 A.2d 981 (Law Div.1983). We thus conclude that the maximum term of incarceration applicable to disorderly persons offenses in combination with the civil remedy of forfeiture were not so onerous as to trigger defendant's constitutional right to a jury trial.
We add that we do not write upon a blank slate. In State v. Hamm, 121 N.J. 109, 577 A.2d 1259 (1990), our Supreme Court held that the statutory penalties applicable to repeat offenders under our drunk driving statutes were not so severe as to trigger the defendant's right to a jury trial. Id. at 111, 577 A.2d 1259. These penalties included a 180 day prison term, community service up to ninety days, and a driver's license suspension of ten years. Id. at 117, 577 A.2d 1259. While recognizing the seriousness of these penalties, the Court concluded that the "collateral consequences" of a drunk driving conviction were not so onerous or disabling as to implicate the right to trial by jury. Id. at 124-25, 577 A.2d 1259. Significantly, the Court alluded to the penalty of forfeiture of office applicable to a public official convicted of an offense involving dishonesty, "no matter how petty," and observed that in such a case the offender would still not have the right to a jury trial. Id. at 125-26, 577 A.2d 1259. The Court's dictum is clearly applicable here.

B.
Our conclusion that the penalties facing Medina were not so serious as to trigger the right to trial by jury does not end the inquiry. Although couched in constitutional verbiage, the essence of defendant's claim is that he was charged with violating the wrong statute. Our statutes provide that theft of a firearm constitutes a crime of the third degree, N.J.S.A. 2C:20-2b(2)(b), while theft of an article worth less than $200 constitutes a disorderly persons offense, N.J.S.A. 2C:20-2b(3). Where the article allegedly stolen is a gun valued at less than $200, the statutes overlap in prohibiting the same basic act. Because N.J.S.A. 2C:20-2b(2)(b) prohibiting the theft of a gun is arguably the more specific of the two subsections, Medina contends that the prosecutor did not have the power to downgrade the indictable charge to a disorderly persons offense.
We disagree with this contention. The mere fact that two statutes overlap in prohibiting the same conduct does not mean that the more specific section automatically applies or that an alleged offender can only be prosecuted for the more serious offense. In State v. States, 44 N.J. 285, 208 A.2d 633 (1965), the defendant was charged in a municipal complaint with assault and battery under the Disorderly Persons Act, N.J.S.A. 2A:170-26 (since repealed). Id. at 288, 208 A.2d 633. The complaint alleged that the defendant shoved a police officer. Ibid. At the time of the incident, N.J.S.A. 2A:90-4 (since repealed) made such an assault a high misdemeanor, an indictable offense within the jurisdiction of the Superior Court with the attendant right to trial by jury. Ibid. In the municipal court, the defendant moved for a dismissal of the disorderly persons complaint, contending that the proper charge should have been assault and battery upon a police officer. Ibid. Although the municipal court denied that motion, the county court dismissed the disorderly persons charge on the *77 ground that the indictable offense should have been charged and that the lower court lacked subject matter jurisdiction. Id. at 289-90, 208 A.2d 633. The Supreme Court reversed and reinstated the disorderly persons charges. Id. at 291-94, 208 A.2d 633. The Court found "no ... incompatibility between the two enactments" merely because they prohibited the same act. Id. at 291, 208 A.2d 633. In reaching that conclusion, the Court emphasized that "[i]n many situations where criminal statutes overlap in prohibiting the same basic act, the proper prosecuting authority in the sound exercise of the discretion committed to him may proceed under either act." Id. at 292, 208 A.2d 633. The Court reasoned that the "prosecuting authority [might not have] fe[lt] justified in charging the more serious offense" in light of the fact that "the attack on the officer was of such an inconsequential character." Id. at 291-92, 208 A.2d 633 The Court added that "[r]elevant practical factors as well as considerations of fair play, and the reasonable expectations of the Legislature and the public relating to control of the conduct proscribed, are permitted to influence the discretion of the proper authority as to the course to be followed." Id. at 292, 208 A.2d 633.
The Court applied the same reasoning in State v. Gledhill, 67 N.J. 565, 342 A.2d 161 (1975). The question presented was "whether one who utters a false or forged credit card with intent to damage or defraud another may be prosecuted under N.J.S.A. 2A:109-1(b) [since repealed], a section of the forgery statute, or whether if he uses the forged credit card to obtain goods or services on credit he may be prosecuted only under N.J.S.A. 2A:111-43 [since repealed]." Id. at 568, 342 A.2d 161. We concluded that "one who illegally uses a forged credit card must be prosecuted exclusively under" the credit card act. State v. Gledhill, 129 N.J.Super. 113, 116, 322 A.2d 471. The Supreme Court reversed. The Court said, "[t]he fact that both N.J.S.A. 2A:109-1(b) and N.J.S.A. 2A:111-43 would apply to the conduct of [the] defendant in this case and that the credit card act is a later enactment dealing specifically with offenses stemming from the possession or use of credit cards, does not mandate a conclusion that prosecution under N.J.S.A. 2A:109-1(b) is precluded." 67 N.J. at 573, 342 A.2d 161. The Court noted that `"specific conduct may violate more than one statute,'" 67 N.J. at 573, 342 A.2d 161 (quoting State v. Blount, 60 N.J. 23, 31, 286 A.2d 36 (1972)), and that in such a case the charging decision falls within the discretion of the prosecutor, 67 N.J. at 573-74, 342 A.2d 161 (citing State v. States, 44 N.J. at 291-92, 208 A.2d 633).
Of similar import are State v. Covington, 59 N.J. 536, 284 A.2d 532 (1971), State v. Reed, 34 N.J. 554, 170 A.2d 419 (1961), State v. Fary, 16 N.J. 317, 108 A.2d 593 (1954), and State v. Milano, 94 N.J.Super. 337, 228 A.2d 347 (App.Div.1967). All of these cases involved overlapping statutes. In Covington, the Supreme Court ruled that the later enacted bad check statute did not supersede, and preclude prosecution for violation of, the false pretense statute even though the instrument of the fraud was a worthless check, and that "the Legislature left it to the sound discretion of the prosecutor to proceed under either of the statutes." 59 N.J. at 538, 284 A.2d 532. In Reed, 34 N.J. at 570-73, 170 A.2d 419, and Fary, 16 N.J. at 321-24, 108 A.2d 593, the Court held that the prosecutor could elect to procure an indictment as opposed to filing complaints under the Disorderly Persons Act, where the respective defendants' conduct fell within the purview of two overlapping statutes. In Milano, we decided that a shoplifter could be prosecuted under the general larceny statute, N.J.S.A. 2A:119-2 (since repealed), *78 despite a later enactment, N.J.S.A. 2A:170-97 to -101 (since repealed) designating shoplifting as a disorderly persons offense. 94 N.J.Super. at 339-40, 228 A.2d 347. We recently applied this rule regarding overlapping statutes in two cases, State v. T.C., 347 N.J.Super. 219, 225-26, 789 A.2d 173 (App.Div.2002) and State v. D.V., 348 N.J.Super. 107, 115, 791 A.2d 304 (App.Div.2001), in which we held that there was no abuse of prosecutorial discretion in charging the defendant under N.J.S.A. 2C:24-4a (endangering welfare of children statute), a second degree offense, "even though [the] defendant's conduct might also constitute a violation of N.J.S.A. 9:6-3" (cruelty and neglect of children statute), a fourth degree offense.
We thus conclude that the prosecutor was empowered to downgrade the third degree offense to a disorderly persons charge upon obtaining the consent of the Law Division judge. Our conclusion is bolstered by N.J.S.A. 2C:20-2a, which provides in pertinent part that:

Conduct denominated theft in this chapter constitutes a single offense, but each episode or transaction may be the subject of a separate prosecution and conviction. A charge of theft may be supported by evidence that it was committed in any manner that would be theft under this chapter, notwithstanding the specification of a different manner in the indictment or accusation, subject only to the power of the court to ensure fair trial by granting a bill of particulars, discovery, a continuance, or other appropriate relief where the conduct of the defense would be prejudiced by lack of fair notice or by surprise.
[Emphasis added.] As stated in the commentary to the Code, "[t]he common unifying conception in all [theft offenses] is the `involuntary transfer of property'; the actor appropriates property of the victim without his consent or with consent obtained by fraud or coercion." Final Report of the New Jersey Criminal Law Revision Commission, Vol. II, at 216 (1971). The purpose of consolidation is to avoid procedural problems. The consolidation section is designed to obviate the problem where a defendant concedes he misappropriated property, but that he accomplished that mission by means other than those alleged in the indictment or other charging instrument. State v. Talley, 94 N.J. 385, 390, 466 A.2d 78 (1983) (citing II Model Penal Code § 223.1 cmt. (2)(b) at 132, 133 (Rev'd Comments 1980)).
It is evident that defendant's claim here is precisely the type that the statute was meant to reach. He is attempting to defeat one charge, the disorderly persons offense of theft, by arguing that he should have been charged with committing a greater crime, third degree theft. "It is unusual to find a defendant contending that he should not be tried on a disorderly persons charge," State v. States, 44 N.J. at 293, 208 A.2d 633, but rather for a third degree crime. The obvious design here is to thwart the prosecutor's exercise of discretion. "Nonetheless, we are not left with any sense of injustice under the circumstances" of this case, nor can we say that defendant was "shortchanged." State v. Talley, 94 N.J. at 391, 466 A.2d 78.
Perhaps it is true that the Legislature anticipated a prosecution in the Superior Court where the offender is alleged to have stolen a gun, even where the firearm is worth less than $200. See State v. Eure, 304 N.J.Super. 469, 475, 701 A.2d 464 (App.Div.1997). It is arguable that "when two statutes govern the same offense, the Legislature generally intends the defendant to be tried and sentenced for the more serious offense or grade of offense." Ibid. But that is not invariably so.
*79 The general structure of the Code is that for each more serious crime, there is a lesser-included offense with a diminished sentencing range. The purpose of this structure is to allow the prosecutor to exercise his discretion in determining whether to charge the more serious crime or the lesser-included offense, and to facilitate plea negotiations. In our criminal justice system, the prosecutor retains broad discretion as to whom to prosecute and what charge to bring. State v. T.C., 347 N.J.Super. at 228, 789 A.2d 173. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611 (1978); see also United States v. Goodwin, 457 U.S. 368, 380 n. 11, 102 S. Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74, 84-85 n. 11 (1982). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547, 556 (1985). "Such factors as the strength of the case," the deterrent value of the prosecution, the prosecutor's law enforcement priorities and allocation of resources, "and the case's relationship to the [State's] overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." Ibid. Moreover, judicial supervision exacts systemic costs. "Examinat[ion][of] the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine" legitimate prosecutorial goals and objectives. Ibid. All of these concerns are substantial and make the courts particularly hesitant to examine the decision to prosecute and the appropriate charge to file.
That is not to say that prosecutorial discretion is unfettered. Once a grand jury has returned an indictment, the matter "passes to the Superior Court." State v. Ashby, 43 N.J. 273, 276, 204 A.2d 1 (1964). The prosecutor cannot dismiss the indictment without the consent of the court. Ibid.; see also R. 3:25-1(b) ("Upon motion by the prosecuting attorney, an indictment, accusation or complaint, or any count thereof, may be dismissed prior to trial by order of the judge to whom the same has been assigned ...."); cf. R. 3:28 (pretrial intervention). That course was faithfully adhered to in this case. The prosecutor moved to downgrade the indictable charges on the ground that two of the defendants had pled guilty, the integrity of the gun amnesty program had been vindicated, and the allocation of scarce resources militated against a full-blown jury trial of the remaining indictable charges. The judge granted the prosecutor's motion on that basis. We perceive no sound basis to disturb the result reached.

III.
Defendant next contends that the Law Division judge erred by failing to recuse himself after adjudicating pretrial motions and reviewing the grand jury transcripts. The gist of defendant's argument is that the judge was exposed to prejudicial and inadmissible evidence in pretrial proceedings, and that he should have disqualified himself from conducting the bench trial. No motion to recuse was ever made. See Magill v. Casel, 238 N.J.Super. 57, 63, 568 A.2d 1221 (App.Div.1990) ("[a] motion for recusal must be made to the judge sought to be disqualified") *80 (citing R. 1:12-2 and N.J.S.A. 2A:15-49). We thus consider defendant's argument within the rubric of the plain error doctrine.
Rule 1:12-1(d) provides that a judge "shall be disqualified on the court's own motion ... if the judge has given an opinion upon a matter in question in the action." However, "the Rule contains an important qualification." State v. Marshall, 148 N.J. 89, 278, 690 A.2d 1 (1997). "A judicial statement of opinion in the course of the proceeding in the case ... or in another case in which the same issue is presented [does] not require disqualification." Ibid. (citing R. 1:12-1). "A judge [may] continue to participate in a case when [an] opinion which he has rendered... was expressed in the course of [the] proceedings regarding the same controversy." Matthews v. Deane, 196 N.J.Super. 441, 444, 483 A.2d 232 (Ch.Div.1984), appeal dismissed, 206 N.J.Super. 608, 503 A.2d 376 (App.Div.1986); see also Hundred East Credit Corp. v. Eric Schuster Corp., 212 N.J.Super. 350, 358, 515 A.2d 246 (App.Div.), certif. denied, 107 N.J. 60, 526 A.2d 146 (1986). The rule's prohibition "is directed primarily at statements made outside of the declarant's role as a judge." State v. Marshall, 148 N.J. at 278, 690 A.2d 1.
Apart from R. 1:12-1(d), a judge must recuse himself "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(f). However, exposure to inadmissible evidence in the course of pretrial proceedings generally does not require disqualification of the judge even where the judge is to serve as the factfinder. "A judge sitting as the factfinder is certainly capable of sorting through admissible and inadmissible evidence without resultant detriment to the decisionmaking process...." State v. Kern, 325 N.J.Super. 435, 444, 739 A.2d 969 (App.Div.1999). Trained judges have the ability "to exclude from their consideration irrelevant or improper evidence and materials which have come to their attention." State v. Kunz, 55 N.J. 128, 145, 259 A.2d 895 (1969).
Having said this, a judge should be sensitive to the perception of the litigants, counsel, or the informed public that his exposure to inflammatory material might irredeemably preclude him from serving as a neutral and impartial arbiter of the facts. We, nevertheless, perceive no abuse of the judge's discretion in this case.

IV.
We reject defendant's argument that the judge's conduct deprived him of a fair trial. Our examination of the record does not support defendant's claim that the judge assumed the role of advocate and asked impermissible questions of defense witnesses.
The parameters of judicial intervention in the conduct of a trial are well settled. Our courts have long rejected the "arbitrary and artificial methods of the pure adversary system of litigation which regards the lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed." State v. Riley, 28 N.J. 188, 200, 145 A.2d 601 (1958), appeal dismissed, cert. denied, 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959). The intervention of a trial judge in the questioning of a witness is both a power and a duty, and forms part of the judiciary's general obligation to ensure a fair trial "conducted in [an] orderly and expeditious manner." State v. Laws, 50 N.J. 159, 181, 233 A.2d 633 (1967). Trial judges are vested with the authority to *81 propound questions to qualify a witness's testimony and to elicit material facts on their own initiative and within their sound discretion. State v. Ross, 80 N.J. 239, 248-49, 403 A.2d 457 (1979). The discretionary power of a judge to participate in the development of proof is of "high value," because a fair trial is his responsibility. State v. Guido, 40 N.J. 191, 207, 191 A.2d 45 (1963); see also N.J.R.E. 611(a) (judge "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to... make the interrogation and presentation effective for the ascertainment of the truth"); N.J.R.E. 614 ("judge ... may call a witness and may interrogate any witness"); Kristine Cordier Karnezis, Annotation, Manner or Extent of Trial Judge's Examination of Witnesses in Civil Cases, 6 A.L.R.4th 951 (1981) ("trial court has the right to act as more than a moderator and to ask questions to clarify counsel's questions and witnesses' testimony in order to fully develop the truth").
Claims of judicial misconduct pose a severe problem to our appellate tribunals for "it is difficult to review a charge of unfairness upon a dry record." State v. Guido, 40 N.J. at 208, 191 A.2d 45. Clearly, such grievances must be weighed against the important interest of preserving order in the courtroom. The intervention of a trial judge is a "desirable procedure," but it must be exercised with restraint. Village of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132, 145 A.2d 306 (1958). "There is a point at which the judge may cross that fine line that separates advocacy from impartiality." Ibid. A trial judge "may so take over the entire proceedings as to create prejudicial error...." Davanne Realty Co. v. Brune, 67 N.J.Super. 500, 511, 171 A.2d 97 (App.Div.1961); see also State v. Ross, 80 N.J. at 249-50, 403 A.2d 457; State v. Ray, 43 N.J. 19, 25, 202 A.2d 425 (1964); State v. Swint, 328 N.J.Super. 236, 260, 745 A.2d 570 (App.Div.), certif. denied, 165 N.J. 492, 758 A.2d 651 (2000).
But isolated instances of judicial annoyance or impatience do not warrant the drastic remedy of vitiating an otherwise valid conviction. "A person's manner may negate a barb his printed word seems to hold, just as it may supply a sting the record will not show." State v. Guido, 40 N.J. at 208, 191 A.2d 45. As with all claims of error, charges of judicial impropriety must be viewed within the context of the entire trial proceedings. But the reviewing court should not evaluate the trial judge's conduct from the vantage point of twenty-twenty hindsight. Rather, appellate courts should recognize that trial judges often must act without the benefit of prolonged and objective research.
Applying these principles, we are satisfied that the judge acted appropriately in his interrogation of witnesses. His questions were clearly designed to clarify issues and ascertain the truth. While several of his evidentiary rulings may appear to have been somewhat inconsistent, defendant was not prejudiced in any way. That some of the judge's questions perhaps missed the mark is of no consequence. This was a bench trial. There was thus no danger that undue emphasis would be placed by a jury on the questions propounded by the judge. We have no reason to doubt the judge's good faith and impartiality. This was a hard-fought trial. The judge maintained an impartial role by propounding questions for the sole purpose of aiding his understanding of the witnesses' testimony. We find no error in the manner in which the proceedings were conducted.

*82 V.
Finally, we reject defendant's attack upon the sufficiency of the evidence. See State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). The State's evidence was extremely compelling. A reasonable trier of the fact could conclude from the evidence that defendant abused the powers of his office by stealing a weapon surrendered under the City's gun amnesty program, and that he obstructed justice by attempting to conceal his participation in the criminal scheme.
Affirmed.