**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0375-19

LEWIS M. HUNT-
IRVING,

     Plaintiff-Appellant,

v.

JAZMIN ESPADA,

     Defendant-Respondent.

_____

Submitted May 4, 2021 – Decided June 23, 2021

Before Judges Gilson and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. SC-000555-19.

Lewis M. Hunt-Irving, appellant pro se.

Respondent has not filed a brief.

PER CURIAM

     Plaintiff Lewis M. Hunt-Irving appeals from the trial court's order dismissing his complaint entered after a bench trial. Plaintiff argues:

I.  THE VERDICT IN FAVOR OF DEFENDANT AND AGAINST THE PLAINTIFF SHOULD BE VACATED AND PLAINTIFF GRANTED A NEW TRIAL, WHERE THE TRIAL COURT DENIED THE PLAINTIFF A FAIR TRIAL.

II.  THE VERDICT OF THE LOWER COURT IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF SHOULD BE VACATED AND PLAINTIFF GRANTED A NEW TRIAL, WHERE THE LOWER COURT'S UNWILLINGNESS TO ENFORCE THE COURT'S SEQUESTRATION ORDER AGAINST DEFENDANT'S WITNESS, ABRIDGED PLAINTIFF'S RIGHT TO A FAIR TRIAL.

III.  THE LOWER COURT'S VERDICT FINDING IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF SHOULD BE VACATED AND PLAINTIFF GRANTED A NEW TRIAL, WHERE PLAINTIFF WAS NOT PERMITTED THE RIGHT TO CROSS EXAMINE DEFENDANT'S ONLY FACT WITNESS WHO [PROFFERED] WHOLLY IRRELEVANT AND HIGHLY PREJUDICIAL TESTIMONY AGAINST PLAINTIFF, WHICH PREJUDICED PLAINTIFF'S RIGHT TO A FAIR TRIAL.

Unpersuaded, we affirm.

Plaintiff alleged he was attending a funeral on November 10, 2018, when his then-"girlfriend,"[1] defendant Jazmin Espada, while a guest at his home, stole cash rental payments for a house owned and leased by plaintiff and his business partner. Plaintiff claimed $2,028 was taken from envelopes kept in his kitchen.

During the trial, at which both parties were self-represented, plaintiff responded to the court's inquiry about how he knew defendant took the money if he was not in the house. He testified his daughter saw defendant

> going through the envelopes . . . and [saw] her doing it. And so that's how [he knew] that she basically did it. Also, it was the fact that once [he] then found out about [the] situation that . . . day, [he] sent her text messages, letting her know that [he] knew she had done it.

Plaintiff also testified he told defendant there was a recording made by a camera in his house. He told the court when the parties spoke on the phone the next day, plaintiff told defendant he would "file charges against her" if she did not return the money. He said defendant agreed to do so, but "as time went on, she refused to return the money."

---

[1] Plaintiff testified he had stopped seeing defendant, who resided in Florida, in May 2018 because she was also seeing another man. He said when she visited in November they were "seeing each other on a basic basis . . . because [they] wanted to see each other."

A-0375-19

The court reviewed the texts sent by plaintiff. Plaintiff initially testified defendant did not respond to the texts, but later said she did respond but "did not respond exactly to what [he] was saying." Plaintiff told the court he did not have anything printed to demonstrate defendant was responding to his texts.

When the court questioned plaintiff about the phone conversation "the next morning" with defendant, plaintiff explained "[t]here's a timing issue messed up here"; he did not find out about the theft until January 16 when his business partner "came over to collect the money." He acknowledged he texted defendant at that time. Plaintiff said the rental envelopes "from February through October . . . were open," but the envelopes for November, December and January were sealed.

The court then asked plaintiff if he had a witness or if there was anything plaintiff would like to say. Plaintiff responded that he wanted to call his daughter, Brandis Irving. When asked if plaintiff had any other witnesses, he identified his business partner, Jason Belfort. The court sequestered Belfort before defendant briefly cross-examined plaintiff and Irving testified.

Irving testified about what she knew about the parties' relationship, particularly recalling plaintiff was angry when he found out defendant had another boyfriend. She also recounted that she entered the kitchen in her father's

A-0375-19

house and saw defendant who "looked up" and "kind of jumped" before they exchanged greetings. Irving saw "that [defendant] had a couple of envelopes" though Irving did not "know what they said on them but [knew] that there was money in it and around." On cross-examination, Irving said she did not know how many envelopes defendant was handling, but "knew there [were] a few, a couple. More than two." She testified she "couldn't count the money . . . but [she] did see a lot of money there. Like, as if [her father] was using it for something to pay for."

Belfort testified that on January 16, 2019, he began opening the envelopes plaintiff had set aside for him. After taking out the money from the January 2019 envelope, he discovered nine envelopes, from February 2018 to October 2018, were empty. Other than the January 2019 envelope, only those for November and December 2018 contained money. He determined $2,028 was missing. On cross-examination, Belfort said, from February 2018 until October 2018, he had not visited plaintiff "specifically to collect rent." When asked by the court why he waited to pick up the rental payments, Belfort said:

> I guess I'm kind of lazy, but I like to pick it up all at –
> I like one lump sum more than just . . . picking it up
> every month.
> That's pretty much it. I don't have any particular
> rhyme or reason. I trust [plaintiff] immensely so we've
> never had an issue with the rent prior to this.

On redirect examination he acknowledged he had last picked up rental payments in January 2018.

Defendant testified about the parties' relationship, starting in 2010 when she was twenty years old; she said plaintiff was fifty-nine. She described plaintiff's harassment over the course of their relationship, causing her to ultimately inform the police in 2016 about "what [was] going on" and that she was moving to Florida. Although she said plaintiff continued to harass her, she admitted she would return to defendant "whenever he would purchase a flight" for her, "[t]hings went on sexually and then [she] would fly back home."

After she met someone else in December 2018, plaintiff "was not happy about it"; she said she tried to break things off and "stopped all communications with him [on] . . . January 27, 2019, [and] that's when all the harassment began with the court system." Defendant described fourteen complaints plaintiff filed against her in various courts. She told the court she kept going back to defendant because "[i]t's emotional abuse and also physical, so [she does] have a fear of him."

She denied being alone in plaintiff's house.

Defendant's mother was called and testified about the parties' relationship, describing it as "a sugar[-]daddy syndrome" with plaintiff who had "been very

6

volatile, very obsessive-compulsive." She described threats plaintiff made to put defendant "in a box and nobody would ever find her" if defendant did not "act appropriately."

At the conclusion of testimony, the trial court "assesse[d plaintiff's] credibility as a key factor." Finding plaintiff was in an "unusual" and "tumultuous" relationship with a woman "dramatically" younger than he, the court concluded plaintiff was "a spurned man. He [did] not try to hide that." The court discerned there were "repercussions when there was infidelity[.]"

The court assessed "this history presented by [plaintiff]," and concluded "there was really a credibility challenge to his testimony, in that it is not reflected accurately that he had the knowledge that the [cash] was . . . stolen in November."

From defendant's testimony, the court found defendant had "a relationship of convenience [with plaintiff]. When she want[ed] something, she [went] and she [got] it from him. She [took] him up on his offers."

The court continued:

> But there is a weighing and a stripping away of credibility that attaches to people when they're known to do anything that's convenient for them of the moment. How do I determine who's telling the truth[?]

7

I don't find [defendant] credible, either. [Defendant] has delusions that she will try to use, perhaps, [plaintiff].

The court also discounted the credibility of plaintiff's witnesses. The court found "Belfort's testimony was perhaps the most credible[,] but it's not helpful" and by "most credible," the court said it was "using a very wide standard because [it did not] know why [he] would wait months" to collect thousands of dollars; the court said, "[t]hat doesn't make sense to me[.]" The court also found though Irving testified credibly, her dependency on her father caused the court to determine it could not "really count her testimony as clear enough and credible enough."

In what the court described as a "very close" case, it determined plaintiff had not established his claim by a preponderance of the evidence, finding the evidence was in equipoise.

"Final determinations made by [a] trial court sitting in a non-jury case are subject to a limited and well-established scope of review." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011); see also City Council of City of Orange Twp. v. Edwards, 455 N.J. Super. 261, 271 (App. Div. 2018). We will not "disturb the factual findings of the trial court 'unless we are convinced that they are so manifestly unsupported by[,] or inconsistent with[,] the competent,

relevant[,] and reasonably credible evidence as to offend the interests of justice.'" City Council of the City of Orange Twp., 455 N.J. Super. at 272 (alterations in original) (quoting D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). A trial court's credibility determinations are also accorded deference because the court "'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "To the extent that the trial court interprets the law and the legal consequences that flow from established facts, we review its conclusions de novo." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017).

Under that deferential standard, we will not disturb the trial court's conclusion that plaintiff failed to carry his burden, a decision firmly rooted in the court's assessment of the witnesses' testimony, which was the bulk of the evidence in this case.[2]

---

[2] The court also considered the text messages and a photograph of the location in the kitchen where the envelopes were stored, as well as three documents—not provided and described as "not individually unidentified" in the record—proffered by defendant as reports or complaints plaintiff made to authorities about defendant. The court accepted the latter three documents subject to plaintiff's argument that the phone number on one was not his; plaintiff said the other two documents were "fine."

A-0375-19

Plaintiff claims his testimony that he was both a funeral director and a dentist was met with "derision and disdain" by the trial court. That slant is not supported by the record. As recounted in plaintiff's merits brief, the court simply asked: "So you go from funeral director to dentist?" Because this was a bench trial, the court had the right to ask questions directed to both parties to ascertain information necessary to render his decision. See State v. Medina, 349 N.J. Super. 108, 131 (App. Div. 2002) ("Trial judges are vested with the authority to propound questions to qualify a witness's testimony and to elicit material facts on their own initiative and within their sound discretion."). Questioning by a trial judge is appropriate where necessary "to clarify [the] issues and ascertain the truth." Id. at 132.

Plaintiff also argues during defendant's mother's testimony, the court "interrupted and inquired if [p]laintiff had ever abused [d]efendant"; plaintiff described it as "a wholly irrelevant inquiry" and an improper line of questioning that abused the court's discretion. Again, the record does not support plaintiff's contention. Defendant, not the court, asked her mother if plaintiff had made any threats against her. The court merely repeated the question for the witness to answer after he overruled plaintiff's objection, determining the testimony might be relevant. We do not perceive that ruling, which we review for abuse of

discretion, State v. Gorthy, 226 N.J. 516, 539 (2016), as "so wide of the mark that a manifest denial of justice resulted," requiring reversal, State v. Carter, 91 N.J. 86, 106 (1982); see also Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016). Indeed, the court did not mention those threats in its oral decision.

Plaintiff's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We briefly note the "disparaging remarks" plaintiff claims the court made were the court's findings based on the evidence presented, including those that supported his credibility determinations based on the parties' interests and bias. Additionally, contrary to plaintiff's contention, the court did not draw an adverse inference against him as a "sugar daddy." In fact, the court sustained plaintiff's objection to defendant's mother's characterization of plaintiff's relationship with defendant as "a sugar[-]daddy syndrome" and found defendant's "relationship of convenience" negatively impacted her credibility. The court's appraisal of the parties' relationship, as it impacted their testimony, was proper. As jurors are instructed, "in determining whether a witness is worthy of belief and therefore credible," consideration may be given to "the witness' interest in the outcome of the trial if any" and "the possible bias, if any, in favor of the side for whom the witness testified[.]" Model Jury Charge (Criminal), "Criminal Final Charge Parts 1 & 2 (General

11

Information to Credibility of Witnesses)" (rev. May 12, 2014).  Furthermore, the record does not support plaintiff's claim that the court denied him the right to cross-examine defendant's mother.  He never sought to cross-examine that witness and he does not proffer what he would have asked; thus, even if the court denied him that opportunity, he has not established he was prejudiced.  R. 2:10-2 (Plain error is error that is "clearly capable of producing an unjust result.").

Finally, plaintiff argues he was denied his right to a fair trial because defendant's mother was not sequestered.  As our Supreme Court noted:

> In New Jersey, decisions concerning witness sequestration have generally been left to the discretion of the trial court.  State v. DiModica, 40 N.J. 404 (1963).  Ordinarily, the sound exercise of that discretion requires granting a timely motion for sequestration.  Id. at 413; State v. Williams, 29 N.J. 27, 46 (1959).
>
> [Morton Bldgs., Inc. v. Rezultz, Inc., 127 N.J. 227, 233 (1992).]

Neither party requested sequestration of witnesses.  The court sequestered Belfort only after he had been identified by plaintiff as a witness and had heard plaintiff testify.  Defendant's mother was not sequestered, but neither was Irving.  Moreover, plaintiff does not specify how he was prejudiced by any lack of sequestration.  See R. 2:10-2.  He did not proffer how defendant's mother's

12

testimony resulted in any collusion or contrived testimony.  See Morton Bldgs., Inc., 127 N.J. at 233 ("The purpose of sequestration is to discourage collusion and expose contrived testimony.").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0375-19